**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| v. | § | Criminal Action No. **3:16-CR-536-L** |
| | § | |
| **ALFREDO NAVARRO HINOJOSA (9)** | § | |

## MEMORANDUM OPINION AND ORDER

Before the court are the Government's Motion for Hearing Regarding Claims of Improper Pressure (Doc. 412), filed May 30, 2019; and Defendant Alfredo Navarro Hinojosa's ("Defendant or " Mr. Hinojosa") Motion to Suppress Statements and Signed Plea Paperwork (Doc. 432), filed June 13, 2019. After careful review of the motions, responses, reply, evidence, record, and applicable law, the court **denies** the Government's Motion for Hearing Regarding Claims of Improper Pressure (Doc. 412); and **denies in part** and **grants in part** Defendant's Motion to Suppress Statements and Signed Plea Paperwork (Doc. 432).

## I.     Procedural Background

This case has been litigated at length, and, thus, both the parties and the court are aware of the complex procedural history and background of this action. Accordingly, the court will only address the procedural history relevant to the present motions.

On May 30, 2019, the Government filed a Motion for Hearing Regarding Claims of Improper Pressure (Doc. 412). It asserted that it expected that Mr. Hinojosa would attempt to "mitigate or minimize" the impact of his recorded confession—taken at a pre-indictment interview with the Government on July 10, 2017—by arguing at trial that his former attorney Frank Perez

("Mr. Perez")[1] or, alternatively, the Government, improperly pressured him into making the confession. To address this potential defense prior to trial, the Government requested that the court direct Defendant to respond to its motion, and his intention with respect to the improper pressure arguments, and, if necessary, schedule a hearing to resolve any remaining issues.

In response, Mr. Hinojosa contended that any pretrial hearing on this matter forces him to:

(1) [] announce one of his defenses prior to trial; (2) [] give an indication [as to] whether he is prepared to waive his Fifth Amendment right not to testify prior to trial; and (3) [] give the [G]overnment a discovery preview of any potential testimony on this matter in advance of trial.

Def.'s Resp. to Mot. for Hr'g, Doc. 425 at 1. He further contends that such hearing would require him to (1) potentially waive attorney-client privilege prior to determining whether such waiver is necessary; and (2) waive his Fifth Amendment right against self-incrimination by requiring him to testify.

In response to the Government's motion, the court, in its Order of May 31, 2019 (Doc. 413), directed Mr. Hinojosa to file a motion to exclude or suppress any statement if he contends that such statements violate the United States Constitution or federal law. Mr. Hinojosa filed his Motion to Suppress Statements and Signed Plea Paperwork (Doc. 432) on June 13, 2019. The trial in this action was originally scheduled for July 29, 2019, but was continued until March 23, 2020.

## II.    Factual Background

As previously stated, the court has issued many orders and opinions in this action, and, given the length of this case, the court will not rehash the complete factual background. Instead, the court focuses on the facts relevant to these motions.

---

[1] Mr. Hinojosa has hired a series of attorneys over the course of this action. Mr. Perez was hired after Mr. Hinojosa released his originally-retained counsel, Messrs. Gary Udashen and Bruce Anton. Mr. Hinojosa also released Mr. Perez and hired his current defense counsel, Mr. Chris Lewis.

On July 7, 2017, Defendant, along with his originally-retained counsel, Gary Udashen ("Mr. Udashen") and Bruce Anton ("Mr. Anton"), met with the Government regarding a pending investigation connected to alleged drug sales in Mr. Hinojosa's nightclubs. Both Defendant and the Government agree that this initial meeting was intended to be a "reverse proffer"[2] session; however, no proffer agreement was signed. Shortly after the meeting, Defendant released Messrs. Udashen and Anton, and hired Mr. Perez as counsel. Mr. Perez, once retained, spoke with the Government, and the parties arranged a meeting for July 10, 2017. The parties dispute the content of the discussions that occurred between the Government and Mr. Perez leading up to the July 10, 2017 meeting, specifically with regard to the nature and intent of that session.

Mr. Hinojosa contends that the Government informed Mr. Perez that he would meet with the Government to "listen[] to some recordings and answer[] questions with the objective of potentially minimizing his criminal exposure or making the investigation against him go away entirely." Def.'s Mot. to Supp., Doc. 432 at 2. The Government asserts that "[Mr.] Perez repeatedly asked whether [Mr.] Hinojosa might avoid being charged altogether, if his cooperation was significant enough[,]" and, in response, it "asked for an interview[,] . . . and told [Mr.] Perez the meeting would be recorded, so as to ensure that if [Mr.] Hinojosa changed his mind regarding cooperation, such an interview could later be used against [him]." Gov't Resp. to Mot. to Supp., Doc. 436 at 8.

On July 10, 2017, Messrs. Hinojosa and Perez met with the Government as planned. Assistant United States Attorneys PJ Meitl ("Mr. Meitl"), Errin Martin, and Rick Calvert were present, along with FBI Special Agent Ashley Davidson, Task Force Officer Paul Lapiano, and an

---

[2] The court understands that a "reverse proffer" is a session in which the prosecutor describes the evidence and potential charges against a defendant while the defendant and his attorney listen to the information set forth by the prosecutor. The case agent or investigator may also be present. This session usually takes place when the Government wants to convince someone to plead guilty or to cooperate with an investigation, rather than go to trial.

intern. Mr. Meitl conducted the interview on behalf of the Government. The interview was recorded and transcribed. Mr. Hinojosa was not in custody at the time of the interview, was free to leave at any time, and had no pending charges against him. *See* July 10, 2017 Mtg. Tr. 2:5-4:4.

At the outset of the interview, and even though Mr. Hinojosa was not in custody, Mr. Meitl decided to read Mr. Hinojosa his *Miranda* rights to ensure he was aware of them. *See id.* at 3:5-4:3. Mr. Hinojosa verbally confirmed that he understood his rights. According to the transcript, he was then handed an "Advice of Rights" form memorializing the rights read to him. Mr. Meitl then stated:

> [I]f you sign that[,] you are waiving [] those rights and agreeing to speak us. . . . Frank[,] just so we're clear, uhm, what we are talking about now is effectively what we showed him last week [at the reverse proffer session], meaning some of the charges that we are considering charging him, uh, with. And this is not under a proffer at this point. He will get a proffer letter at some point regarding additional activity, but he is not going to be covered for what he is talking about today. Meaning whatever you admit to us today, or don't admit to us, we can use against you if you decide to later not cooperate with us and go to trial. And the reason we are doing that is because that way I have confidence that this isn't a ploy or some scheme to try and get around this and just delay things.

*Id.* at 4:17-5:12. Both Mr. Hinojosa and Mr. Perez independently confirmed that Mr. Meitl's representations "made sense" to them. *Id.* at 5:15-17. Mr. Meitl then reiterated his position by stating:

> [J]ust so we are totally clear, Mr. Hinojosa, if you decide in a week or tonight or a month, "You know what, I want to go to trial." That's fine, you have the right to do that, but then [] we have the right to use what you say today against you.

*Id.* at 5:18-24.

After asking Mr. Hinojosa to state his name for the record, Mr. Meitl asked him whether he had any questions before continuing the interview. In response, Mr. Hinojosa stated that there

were a couple of things that he did not talk to Mr. Perez about because "this happened too fast." *Id*. at 6:24-25. Mr. Meitl acknowledged Mr. Hinojosa's concern given that he was "on a fairly short deadline to make a decision." *Id.* at 7:12-14. Mr. Perez, however, informed Mr. Hinojosa that they could stop at any time if he was confused, and the Government representatives would step out of the room for them to talk about it. Mr. Hinojosa verbally acknowledged that he understood.

After a series of preliminary questions regarding Mr. Hinojosa's ownership and oversight of the nightclubs under investigation, Mr. Meitl asked him about recordings in which people stated that he was fully aware of drug sales going on in his three nightclubs. Mr. Meitl also highlighted that in the recordings Mr. Hinojosa stated, "in various different forms, 'We have to let it happen, because if we don't, we lose customers.'" July 10, 2017 Mtg. Tr. 13:23-14:9. In response, Mr. Hinojosa admitted that he saw the video and agreed that it was his voice; however, he wanted to retract the statement made on the video and asserted that he said, "Clean it up. [] Please don't do it." *Id.* at 14:15-21. Mr. Meitl then stated, "Okay, Mr. Hinojosa, my understanding was you were coming down here today to largely admit to what we were alleging." *Id.* at 14:22-24. Mr. Hinojosa replied, "No, I admit to what you show me and what I say, yes." *Id.* at 15:1-2. He then goes on to assert that he never approved drug sales in his clubs and has always been against it. *See id.* at 15:7-11.

Mr. Meitl told Mr. Perez that he thinks they have a problem, which prompted Mr. Perez to ask for an opportunity to talk to Mr. Hinojosa and "clear this up." *Id.* at 15:14-15. Mr. Meitl stopped the recording at 4:18 p.m., and Messrs. Perez and Hinojosa privately spoke during the break. According to Mr. Hinojosa, during this private exchange, "[Mr.] Perez communicated the importance of cooperating with the [G]overnment in order to achieve a favorable plea agreement."

Def.'s Mot. to Supp. 4. At 4:21 p.m., the interview resumed, and contrary to his initial statements, Mr. Hinojosa admitted to his involvement in and the elements of conspiracy to manage a drug premises. *Id*. Several subsequent meetings between Mr. Hinojosa and the Government occurred, which ultimately resulted in the Plea Agreement at issue.

On November 17, 2017, Mr. Hinojosa met with Mr. Perez to discuss the terms of the Plea Agreement. He contends that, "based on his understanding of why he was cooperating with the government, [he] believed the plea agreement would include a five-year maximum or 'cap.'" Def.'s Mot. to Supp. 5. After seeing that this five-year cap was not part of the agreement, Mr. Hinojosa became hesitant and said he needed to think about the offer. He contends that Mr. Perez said that he would speak with Mr. Meitl, and Mr. Hinojosa left his office without signing the agreement. Shortly after his departure, however, Mr. Hinojosa contends that Mr. Perez told him to return to his office, at which time, he informed Mr. Hinojosa that Mr. Meitl wanted the signed Plea Agreement that day, or he would immediately arrest Mr. Hinojosa and his employees. Despite Mr. Perez saying he would continue to negotiate the terms of the Plea Agreement, Mr. Hinojosa asserts that he was left "with no choice but to sign the plea paperwork as it was presented," as a threat of arrest right before Thanksgiving "was, by extension, a threat to cripple and shut down [his] businesses by virtue of arresting all of the individuals necessary to operate" them. *Id.* Accordingly, Mr. Hinojosa signed the Plea Agreement that day.

The Factual Résumé (Doc. 126), Plea Agreement (Doc. 127), and Plea Agreement Supplement (Doc. 128) were filed on December 6, 2017, charging Hinojosa with Counts 20 and 21 of the Superseding Indictment.[3] Despite executing the Plea Agreement, Mr. Hinojosa never entered a guilty plea as to the charges set forth in the plea paperwork. Instead, on December 13,

---

[3] The Superseding Indictment was filed on December 5, 2017, and included 33 counts. In the Superseding Indictment, Mr. Hinojosa was charged with 22 of those counts.

2017, Mr. Hinojosa pleaded not guilty as to Counts 1-21, and 25 of the Superseding Indictment during his arraignment hearing. A rearraignment hearing was scheduled for January 16, 2018.

On January 11, 2018, Mr. Chris Lewis ("Mr. Lewis") was substituted as counsel of record for Mr. Hinojosa. After obtaining new counsel, Mr. Hinojosa decided to maintain his plea of not guilty and filed a Motion to Withdraw Plea Agreement (Doc. 204) on January 15, 2018, seeking to withdraw the Plea Agreement pursuant to Rule 11(d)(1) of the Federal Rules of Criminal Procedure. On February 8, 2018, Mr. Hinojosa filed an Unopposed Motion to Withdraw his Motion to Withdraw Plea Agreement (Doc. 219), stating that he never entered a plea of guilty or nolo contendre as contemplated by Rule 11(d), and, thus, the request to withdraw the Plea Agreement was unnecessary. The court granted the motion to withdraw the document, and the Plea Agreement, along with the Factual Résumé and Plea Agreement Supplement, was never withdrawn.

## III. Defendant's Motion to Suppress July 10, 2017 Statements

In his Motion to Suppress (Doc. 432), Mr. Hinojosa makes minimal allegations that he was improperly pressured into making any statement at the July 10, 2017 meeting with the Government. To the extent such arguments are made, they were made in passing, or in the context of oblique references, rather than as the crux of Defendant's Motion to Suppress. Instead, he asserts that the statements made during that meeting were made during and in furtherance of plea negotiations and, accordingly, are inadmissible pursuant to Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410.

In response, the Government asserts that the July 10, 2017 interview was not part of plea negotiations because, among other things: (1) Defendant had not yet been indicted at the time of the interview; (2) no plea offer had been made; and (3) Mr. Meitl read Defendant his Fifth

Amendment rights at the beginning of the interview, which the Government asserts is "antithetical to a negotiation." Gov't Resp. to Mot. to Supp. 9. Accordingly, it asserts that the interview was not in furtherance of plea discussions, and, thus, any statements made by Mr. Hinojosa are admissible.

### A.      Applicable Authority

Federal Rule of Criminal Procedure 11(f) governs the admissibility or inadmissibility of a plea, plea discussions, and related statements. The rule provides: "The admissibility or inadmissibility of a plea, a plea discussion, and any related statement is governed by Federal Rule of Evidence 410." Fed. R. Crim. P. 11(f). Federal Rule of Evidence 410(a) states:

> [E]vidence of the following is not admissible against the defendant who made the plea or participated in the plea discussions:
>
> > (1) a guilty plea that was later withdrawn;
> >
> > (2) a nolo contendere plea;
> >
> > (3) a statement made during a proceeding on either of those pleas under Federal Rule of Criminal Procedure 11 or a comparable state procedure; or
> >
> > (4) a statement made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea or they resulted in a later-withdrawn guilty plea.

Fed. R. Evid. 410(a). In this case, subparts (1)-(3) do not apply because Defendant did not enter a guilty plea or a nolo contendere plea to any of the counts charged against him in the Superseding Indictment, nor did any proceeding occur related to such a plea. Thus, the issue is whether the statements made by Mr. Hinojosa during the July 10, 2017 meeting were "made during plea discussions with an attorney for the prosecuting authority." Fed. R. Evid. 410(a)(4).

In determining whether the July 10, 2017 interview should be characterized as plea discussions, the court carefully considers the totality of the circumstances, and such an inquiry is fact specific. *United States v. Robertson*, 582 F.2d 1356, 1366 (5th Cir. 1978). The court applies

a two-part test in determining the proper characterization by determining whether: (1) "the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion;" and (2) "the accused's expectation was reasonable given the totality of the objective circumstances." *Id.* (citations omitted). "The court must focus searchingly on the record to determine whether the accused reasonably had such subjective intent, examining all of the objective circumstances." *Id.* at 137.

The Fifth Circuit has also recognized a difference between confessions or admissions made during the course of plea negotiations, and those which are made "wholly independent from any negotiations," the latter category being admissible. *Id.* at 1368. Moreover, unlike the rule set forth in *Miranda v. Arizona*, Federal Rule of Evidence 410 "do[es] not have as [its] purpose the protection of criminal defendants from unwise or uninformed decisions." *Id.* "A bargained confession, without more, is not a plea negotiation." *Id.* at 1369.

### B. Discussion

#### 1. *Defendant's Contentions*

As previously discussed, in determining whether the statements made during the July 10, 2017 meeting are admissible, the court must determine whether the meeting can be characterized as plea discussions or negotiations. Considering the *Robertson* analysis, Mr. Hinojosa argues that he had a subjective expectation that he was engaging in plea negotiations, and that his expectations were reasonable in light of the circumstances surrounding the July 10, 2017 interview. Thus, according to him, the statements he made were in furtherance of plea negotiations, which render them inadmissible under Rule 11 of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence.

With regard to the first prong of the *Robertson* analysis, Mr. Hinojosa contends that his subjective mentality concerning the July 10, 2017 meeting can be seen through his actions. Specifically, he highlights that his first meeting with the Government on July 7, 2017 was intended to be a reverse proffer. Mr. Hinojosa also heavily relies on conversations with his former attorney Mr. Perez, in which Mr. Perez "repeatedly told [him] that he needed to cooperate with the [G]overnment to obtain a favorable plea agreement[,]" and "that his cooperation would result in a plea agreement where [his] sentence would be capped at 5 years." Def.'s Mot. to Supp. 9-10. He also contends that Mr. Meitl's statements during the July 10, 2017 interview "made clear" that the interview was in furtherance of plea discussions. For example, Mr. Hinojosa contends that Mr. Meitl "felt [Mr.] Hinojosa was frustrating his efforts to secure a guilty plea" and "that he thought they had a problem because [Mr.] Hinojosa was not admitting to the elements of the crime." *Id.* at 9. During the interview, Mr. Perez asked for a break, and during that time, Mr. Hinojosa contends that Mr. Perez "reminded [him] that if he wanted to reach a favorable plea agreement, he needed to cooperate." *Id.* Thus, only after the break, did he begin to admit to the elements of the crime that led to the Plea Agreement.

Additionally, Mr. Hinojosa asserts that, "like many cooperating witnesses during plea negotiations," he was asked to provide information on others involved in the drug trafficking organization during subsequent meetings with the Government. *Id.* at 10. Thus, based on these actions and statements and the conversations with Mr. Perez, Defendant contends that he had the subjective expectation that the conversation during the July 10, 2017 meeting was in furtherance of plea negotiations.

Concerning the second prong of the analysis, Mr. Hinojosa asserts that his expectation was reasonable based on the totality of circumstances. Specifically, he contends, although in a

conclusory manner, that the July 7, 2017 meeting "was solely for the purpose of convincing a defendant to forego trial and engage in plea negotiations." *Id.* at 9. He also asks the court to consider his role in subsequent meetings, and Mr. Meitl's repeated comments during the July 10th meeting in which he alluded to future meetings. Further, he asserts that Mr. Meitl's comments implied that both parties expected future negotiations to take place in furtherance of reaching a plea agreement[,]" and that "[m]ultiple meetings are common and indicative of plea negotiations." Def.'s Mot. to Supp. 9. Thus, he contends that the meetings with the Government, statements by Mr. Meitl and Mr. Perez, and the ultimate manifestation of a signed Plea Agreement demonstrate that his expectation was reasonable.

### 2. *Government's Contentions*

In response to Defendant's contentions, the Government contends that Defendant's arguments fail because there is no basis for the assertion that he believed that he was engaged in plea discussions during the July 10, 2017 meeting, nor is there a reasonable basis for such a belief. The Government further contends that Mr. Hinojosa's statements from the July 10, 2017 interview were confessions or admissions that were "wholly independent from any plea negotiations" and, thus, are admissible. Gov't Resp. to Mot. to Supp. 3 (quoting *Robertson*, 582 F.2d at 1368).

Specifically, the Government asserts that Mr. Hinojosa did not have a subjective expectation that the July 10, 2017 interview constituted plea negotiations. It also contends that, prior to the meeting, Mr. Perez "repeatedly asked whether Hinojosa might avoid being charged altogether, if his cooperation was significant enough." Gov't Resp. to Mot. to Supp. 8. Thus, according to the Government, Defendant could not have viewed the meeting as plea discussions because his intent was not to plea but instead to avoid charges altogether. In response to Mr. Perez's inquiry, the Government asserts that it told him that "the meeting would be recorded, so []

that if [Mr.] Hinojosa changed his mind regarding cooperation, such an interview could later be used against [him]." *Id.*

The Government further contends that the conversation between it and Mr. Hinojosa at the beginning of the interview demonstrates his expectations concerning the meeting. For example, he was read his *Miranda* rights and waived them, knew the meeting was being recorded, and was told that "whatever you admit to [the Government] today, or don't admit [], [] can [be] use[d] against you if you decide to later not cooperate[.]" July 10, 2017 Mtg Tr. 5:4-7. Moreover, Mr. Hinojosa "had not been charged [or] provided with any plea papers, and no offer to plead had been made before or was made during the meeting." Gov't Resp. to Mot. to Supp. 9. Additionally, the Government contends that Mr. Hinojosa did not offer to plea and, instead, initially denied basic elements of the crime. It further notes that Mr. Hinojosa's Motion to Suppress relies on conversations and meetings that occurred after July 10, 2017, and it asserts that it is hard to believe that these subsequent meetings could impact his subjective expectation at the earlier meeting. Thus, according to the Government, these facts demonstrate that Mr. Hinojosa had no subjective expectation to negotiate a plea during the July 10, 2017 meeting.

To the extent the court rejects the Government's position concerning the first prong of the *Robertson* analysis, it contends that Defendant's argument fails under the second prong. In support of this argument, the Government contends as follows: (1) A plea deal nor a deadline by which to plead was ever discussed; (2) Neither Mr. Hinojosa nor Mr. Perez reference Federal Rule of Evidence 410 or Federal Rule of Criminal Procedure 11; (3) Mr. Hinojosa was read his rights, had no pending charges against him, and could have ended the interview at any time; (4) Mr. Hinojosa was not provided any draft plea papers during the meeting and did not receive plea papers until months after the July 10, 2017 meeting; (5) The meeting was recorded, and no negotiation

regarding charges was discussed during the meeting; and (6) Mr. Hinojosa did not ask to plead guilty nor was he asked to do so. *See* Gov't Resp. to Mot. to Supp. 10-11. Further, the Government also highlights that at the outset of the interview, Mr. Meitl informed Mr. Hinojosa that the meeting was not a proffer session and that anything he admitted or did not admit during that interview could later be used against him at trial. It further notes that Mr. Hinojosa initially denied certain facts at the outset of the meeting that he later admitted. Considering these facts and the totality of circumstances, the Government contends that Mr. Hinojosa could not have reasonably believed that the July 10, 2017 meeting was a plea negotiation or discussion. Thus, any statements made during that meeting are admissible.

        3.     *Analysis*

After careful consideration of the parties' written submissions, the transcript of the July 10, 2017 interview, and the applicable law, the court determines that the statements made during the interview were not in furtherance of plea negotiations. First, the court determines that Mr. Hinojosa did not exhibit an actual subjective expectation to negotiate a plea at the July 10, 2017 meeting, as his actions and comments early in the interview are contrary to such an inference. For example, when asked about his knowledge of drug sales in the bathrooms of his nightclubs, Mr. Hinojosa asserted that he was trying to stop the drug sales because he and his managers "don't profit from it [and] it [] doesn't do [them] any good." July 10, 2017 Mtg. Tr. 12:7-22. Mr. Meitl then asked Mr. Hinojosa about a video of him saying, "We have to let it happen, because if we don't, we lose customers." *Id.* 14:7-9 (internal quotation marks omitted). Mr. Hinojosa admitted it was his voice but became hesitant in his responses and wanted to "retract" that statement. He then continued to allege that he never approved the sale of drugs in his nightclubs until his attorney requested a break.

After the three-minute break, Mr. Hinojosa completely contradicted his previous testimony. He contends that the change in course was due to Mr. Perez reminding him during the break that he needed to cooperate if he wanted to reach a favorable plea agreement. Thus, he suggests that this private conversation demonstrates his subjective intent to negotiate a plea. The court, however, finds this unavailing.

Even assuming Mr. Perez made this comment, it is not indicative of Mr. Hinojosa's subjective expectation to negotiate a plea at the time his statements were made, especially when he initially made untrue statements concerning his knowledge and involvement in the underlying events of this action. Moreover, at the time Mr. Hinojosa decided to be more forthcoming with information, Mr. Meitl had already made it unequivocally clear that anything Mr. Hinojosa said during that meeting could be used against him and that his statements were not covered by a proffer. Further, Mr. Meitl made no mention of a possible plea being on the table. Instead, he stated that the meeting was an opportunity to ensure that Mr. Hinojosa was not trying to delay things. Thus, at the time Mr. Hinojosa voluntarily and knowingly confessed to or acknowledged his involvement in the drug trafficking, Mr. Meitl had not offered anything in return for his confession or admission.

Nonetheless, Mr. Hinojosa contends that he was informed by Mr. Perez prior to the July 10th meeting that the objective of the meeting was to "potentially minimize[e] his criminal exposure or mak[e] the investigation against him go away entirely." Def.'s Mot. to Supp. 2. While that may be true, it does not necessarily make his conversation with the Government a plea discussion, especially when the parties make no reference to a plea agreement or the possibility of one leading up to or during the July 10, 2017 meeting. Instead, Mr. Hinojosa asks the court to speculate or assume that the Government's intent to work toward a plea agreement during the July

10th meeting is evidenced by the subsequent meetings that ultimately resulted in the signed Plea Agreement. That latter discussions took place and resulted in a plea agreement, however, is not determinative in deciding whether a subjective expectation existed during the July 10, 2017 meeting, as any alleged expectation of negotiating a plea was not shown until after the Government had clearly established the purpose of the meeting. The court, therefore, determines that, Mr. Hinojosa fails to establish the first prong of the *Robertson* analysis because, based on Defendant's own actions and statements, he did not have a subjective expectation to negotiate a plea at the time of the July 10, 2017 interview.

Even assuming that the statements made by Mr. Perez to Mr. Hinojosa concerning the nature of the July 10th meeting are true and Mr. Hinojosa did have a subjective expectation to negotiate a plea, his argument fails under the second prong of the *Robertson* analysis. Considering the totality of the circumstances, as evidenced by the parties' own admissions and the interview transcript, any expectation Mr. Hinojosa may have had to negotiate a plea was unreasonable.

Mr. Meitl made several representations at the beginning of the interview signaling that any statements made by Mr. Hinojosa during that meeting could be used against him—statements that contradict any characterization of the July 10th meeting as plea discussions.

First, Mr. Meitl had Mr. Lapiano read Defendant his *Miranda* rights even though he was not in custody, and Mr. Hinojosa acknowledged those rights and chose to speak with the Government in the presence of his attorney. *See* July 10, 2017 Mtg. Tr. 3:13-4:4; 4:13-19. Second, Mr. Meitl informed Mr. Hinojosa that the meeting was not under a proffer and that whatever he admitted or did not admit at that meeting could be used against him if he later decided to go to trial. Mr. Meitl stated that the rationale for that decision was to make sure that the meeting was not "a ploy or some scheme to try and get around this and just delay things." *Id.* at 5:8-12. Both

Mr. Hinojosa and Mr. Perez verbally acknowledged that they understood the terms presented by Mr. Meitl, and Mr. Meitl repeated that anything said by Mr. Hinojosa during the meeting could be used against him at trial, to which Mr. Hinojosa again verbally acknowledged his understanding. *Id.* at 5:18-25. Thus, twice Mr. Hinojosa acknowledged an understanding of his rights and, nonetheless, he chose to make statements to the Government.

Additionally, despite Mr. Hinojosa's assertions, the mere mention of possible meetings in the future does not mean that, at the time of the July 10, 2017 meeting, he had a reasonable expectation of plea negotiations taking place. At most, he was hopeful that such negotiations would occur, but the objective considerations surrounding the meeting do not support a determination that a plea agreement was afoot or that plea negotiations were guaranteed.

The court also finds Mr. Hinojosa's reliance on the later-manifestation of a plea agreement unpersuasive. Even though a plea agreement was executed over four months after the July 10th interview, there is no indication that the meeting was intended to involve plea discussions or that a plea agreement would result. Instead, the court reasonably infers the opposite—that the Government was not willing to consider a plea until after it knew whether Mr. Hinojosa was willing to cooperate. *See id.* at 4:17-5:12. Thus, even once Mr. Hinojosa had a change of heart about admitting his involvement, it had already been established that the meeting was conducted without any promise, consideration, or guarantee of a plea agreement. The court, therefore, determines that Mr. Hinojosa also fails meet the second prong of the analysis.

As both prongs of the *Robertson* analysis fail for the reasons herein stated, the court determines that statements made during the July 10, 2017 interview were not made in furtherance of plea discussions. Thus, the statements made during that interview are not inadmissible under Federal Rule of Criminal Procedure 11 and Federal Rule of Evidence 410, and, accordingly, the

court **denies** Defendant's Motion to Suppress to the extent it seeks to suppress the statements made during the July 10, 2017 meeting.

Even if the July 10, 2017 meeting constituted plea negotiations, Mr. Hinojosa waived the protections afforded by Federal Rule of Criminal Procedure 11 and Federal Rule of Evidence 410. The Fifth Circuit has established that a defendant can fully waive the protections afforded under these rules if he or she does so knowingly and voluntarily, and in the presence of counsel. *See United States v. Olano*, 507 U.S. 725, 733 (1993) ("[W]aiver is the intentional relinquishment or abandonment of a known right.") (internal quotations and citation omitted); *United States v. Mezzanatto*, 513 U.S. 196, 2010 (1995) (holding that "absent some affirmative indication that the agreement was entered into unknowingly or involuntarily, an agreement to waive the exclusionary provisions of the plea-statement Rules is valid and enforceable."); *United States v. Sylvester*, 583 F.3d 285 (5th Cir. 2009) (upholding admission of statements made during failed plea negotiations, as the defendant knowingly and voluntarily waived protections in the presence of his attorney, and expanding the holding in *Mezzanatto*).

During the July 10, 2017 meeting, Mr. Hinojosa verbally confirmed twice that he understood that any statements made during the interview could be used against him at trial, prior to being questioned about the underlying facts. Additionally, he acknowledged that he was at the meeting voluntarily and knowingly made the statements at issue in the presence of his former attorney, Mr. Perez, after being read his rights. *See* July 10, 2017 Mtg. Tr. 2:5-4:4. The court, therefore, determines that even if the July 10, 2017 meeting could be characterized as plea discussions, Mr. Hinojosa waived any protections under Federal Rule of Criminal Procedure 11 and Federal Rule of Evidence 410, and, thus, any statements made are admissible. Accordingly, the court also **denies** Defendant's Motion to Suppress on this basis as well.

## IV.    Defendant's Motion to Suppress Plea Paperwork

Mr. Hinojosa contends that the plea paperwork[4] is inadmissible under Federal Rule of Criminal Procedure 11 and Federal Rule of Evidence 410 because (1) the plea paperwork was made in furtherance of plea negotiations, and (2) he never entered a guilty or nolo contendre plea. In response, the Government contends that Mr. Hinojosa waived any protections under the above-referenced rules by signing the Plea Agreement (Doc. 127), which included a waiver clause. Specifically, the Government references paragraph 10 of the Plea Agreement, which provides as follows:

> **Violation of agreement**: The defendant understands that if the defendant violates any provision of his agreement, or if the defendant's guilty plea is vacated or withdrawn, the government will be free from any obligations of the agreement and free to prosecute the defendant for all offenses of which it has knowledge. In such event, the defendant waives any objections based upon delay in prosecution. If the plea is vacated or withdrawn for any reason other than a finding that it was involuntary, the defendant also waives objection to the use against the defendant of any information or statements the defendant has provided to the government, and any resulting leads.

Plea Agreement 6-7.  Thus, according to the Government, Mr. Hinojosa waived any objection to the introduction of the plea paperwork at trial.

It is well-established in the Fifth Circuit that, while a withdrawn guilty plea and plea agreement are generally inadmissible under Federal Rule of Evidence 11 and Federal Rule of Evidence 410, this protection may be waived so long as the waiver is "explicit, knowing, and voluntarily, for the purpose of impeachment," and "for admission in the government's case-in-chief."  *United States v. Escobedo*, 757 F.3d 229, 233 (5th Cir. 2014) (citing *Mezzanatto*, 513 U.S. 196; and *Sylvester*, 583 F.3d at 289).  Further, a plea agreement is treated like a contract, and any ambiguity is construed against the Government as the drafter.  *Escobedo*, 757 F.3d at 233 (string

---

[4] The court reasonably infers that "plea paperwork" collectively refers to the Factual Résumé (Doc. 126), Plea Agreement (Doc. 127), and Plea Agreement Supplement (Doc. 128).

citations omitted).  In support of its assertion that the waiver provision precludes Mr. Hinojosa from suppressing the plea paperwork, the Government relies on several cases, but it most heavily relies  on *United States v. Nelson*, 732 F.3d 504 (5th Cir. 2013).  The court, however, finds the facts in *Nelson* distinguishable from the facts underlying the present case.

In the *Nelson* case, the defendant agreed to plead guilty to the charged offense and, in anticipation of such plea, signed a plea agreement, which contained stipulated facts related to the charged offense.  The plea agreement also included a provision permitting the Government to use against him "any information provided by the defendant, including but not limited to the factual stipulation contained in this Plea Agreement[.]"  732 F.3d at 513 (internal quotation marks omitted).  The defendant later decided not to enter a guilty plea as agreed, and the Government sought to enforce the waiver provision and admit the stipulated factual basis.  The court considered the plain language of the waiver provision, which explicitly went into effect under specific circumstances, including in the event the defendant failed to plead guilty to the Bill of Information, which is what occurred.  *See* Nelson Plea Agmt., Doc. 436-2, ¶ 6.  The court further relied on Supreme Court precedent in holding that, "absent some affirmative indication that the agreement was entered into unknowingly or involuntarily, an agreement to waive the exclusionary provisions of the plea agreement Rules is valid and enforceable."  *Nelson*, 732 F.3d at 517 (quoting *Mezzanatto*, 513 U.S. at 210 (internal quotation marks omitted)).  Accordingly, the Fifth Circuit determined that the defendant knowingly and voluntarily waived his protections, and, by failing to enter a guilty plea, he breached the agreement.  Thus, the stipulated facts were admissible.  Similarly, the Government contends that the same outcome is appropriate for Mr. Hinojosa's case.

In response, Mr. Hinojosa notes that the Plea Agreement in the *Nelson* case was more specific than his, and that, instead, the court should consider the binding precedent set forth in the *Escobedo* case. In *Escobedo*, the defendant signed a plea agreement that provided:

> If defendant should fail in any way to fulfil completely all of the obligations under this plea agreement, . . . all statements made pursuant to this plea agreement will be admissible against [Escobedo] who hereby waives the provisions of Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence.

*Escobedo*, 757 F.3d at 233. Pursuant to the agreement, the defendant entered a guilty plea before the magistrate judge but withdrew his plea before the district court accepted it, and, thus, under Federal Rule of Criminal Procedure 11, his plea was not yet final.

Given that the defendant had withdrawn his guilty plea, the district court allowed the Government to introduce the factual basis of the withdrawn plea agreement and the statements made in connection with his guilty plea for purposes of impeachment and in its case-in-chief. *Id.* at 232. The Fifth Circuit reversed the district court's decision, concluding that the language of the waiver provision was ambiguous and did not define what constituted a breach of the agreement. Thus, it determined that the contract was ambiguous and must be construed reasonably in the defendant's favor; therefore, the exclusionary waiver had not become effective. Accordingly, the Fifth Circuit held that the withdrawn plea agreement and statements he made in connection with that plea were inadmissible.

Considering the facts of this case, the court determines that the current conundrum falls somewhere in-between the rationale in *Nelson* and that in *Escobedo*, as the language in Mr. Hinojosa's agreement is not as inclusive as that in *Nelson* or ambiguous as that determined in *Escobedo*. The waiver provision in Mr. Hinojosa's Plea Agreement is clear that in the event his *guilty plea* is withdrawn or vacated, the Government may use any statements or information he

has provided against him at trial. Unlike *Nelson*, however, there is no language in Mr. Hinojosa's Plea Agreement that makes the waiver provision go into effect if he *failed to enter a guilty plea*, which is what happened here. Instead, considering the plain language of the Plea Agreement, the court determines that the circumstances upon which the agreement and related statements are admissible are limited to three situations: (1) the defendant violates a provision of the agreement; (2) the defendant withdraws his guilty plea for reasons other than a finding that it was entered into involuntarily; and (3) the defendant's guilty plea is vacated for reasons other than a finding that it was entered into involuntarily.

The Government makes no assertion that Mr. Hinojosa violated any other provision of the Plea Agreement beyond allegedly withdrawing his guilty plea. Moreover, the record is clear that Mr. Hinojosa at no point entered a plea of guilty or nolo contendre before a magistrate judge, and, thus, this court has not accepted such a plea.[5] As none of these limited circumstances applies, the court concludes that the waiver provision has not yet gone into effect. Despite this, the Government is asking the court to infer that its intent was to make the waiver effective even if no guilty plea was entered. The court, however, will not do that in this instance, as it is reasonable for Mr. Hinojosa to assert that the waiver does not apply based on the plain language of the agreement when he never entered a guilty plea and, thus, had nothing to withdraw. If the Government intended for the court to apply the same outcome provided in *Nelson*, it should have drafted the agreement to include the possibility that Mr. Hinojosa may fail to plead guilty. Without explicit language supporting that outcome, the court cannot read such language into the agreement.

---

[5] The Government asserts that "[Mr.] Hinojosa filed a motion to withdraw his guilty plea, which was granted by the Court." Gov't Resp. to Mot. to Supp. 14 (citing Doc. 219 & 222). This is a mischaracterization of the procedural history. Although Mr. Hinojosa filed a motion to withdraw his guilty plea, he subsequently filed a motion to withdraw his motion seeking to withdraw the guilty plea, deciding that doing so was unnecessary since he had not pleaded guilty to the charges against him. The court granted his request to withdraw that motion, not his prior request to withdraw his plea, as there was no guilty plea to withdraw.

The Government also relies on this court's discussion during the sentencing hearing in *United States v. Evans*. While the court acknowledges the factual similarities between *Evans* and the present case, there are also factual distinctions that cause the court to diverge from the snippets of the transcript that the Government presented. In the *Evans* case, the defendant initially signed a plea agreement, which included a waiver clause that stated: "If the plea is vacated or withdrawn for any reason other than a finding that it was involuntary, Evans also waives objection to the use against her of any information or statements she provided to the government, and any resulting leads." Case No. 3:15-cr-514-L(14), Doc. 61 ¶ 10. Ms. Evans did not enter a guilty plea at any point and, instead, sought to withdraw the Plea Agreement and Factual Résumé, which the court granted. She then entered a plea of not guilty.

Prior to trial, the Government provided notice of its intent to introduce the Plea Agreement and Factual Résumé at trial for impeachment purposes in the event Ms. Evans testified. Defense counsel did not object, and, in opening arguments, he discussed the Plea Agreement and the Factual Résumé in front of the jury. Defense counsel's discussion of the withdrawn plea paperwork further waived any objection to the Government's admission of such documents.

During the sentencing, and with new counsel, Ms. Evans asserted that the plea paperwork should not have been admitted under the Federal Rules. In considering Ms. Evans's argument, the court determined that the waiver language was unequivocally clear and that she had waived any objection to the introduction of such plea documents when she signed the Plea Agreement. The court further determined that, even if the court erred in admitting the plea paperwork during trial, "there was an abundance of other evidence that in the Court's estimation was overwhelming to

show that Ms. Evans was guilty of the two counts charged in the indictment." *Evans* Sent. Hr'g. Tr., No. 3:15-cr-519-L (14), at 103:3-9.[6]

On appeal, Ms. Evans objected to her sentence and conviction on several bases, including that the court erred by allowing the Government to introduce her plea paperwork during trial. The Fifth Circuit did not address this issue and instead noted, as did this court, that the evidence demonstrating her guilt was overwhelming even without consideration of the withdrawn plea agreement. *See United States v. Evans*, 753 F. App'x 295, 298 (5th Cir. 2018).

Unlike *Evans*, Mr. Hinojosa is raising his objection to the admission of the plea paperwork prior to trial rather than after such objections have been waived, and the court determines that the distinctions in procedural posture are relevant. Moreover, given the potential prejudice that may occur at this stage of the proceedings, the court must carefully consider the specific facts surrounding this case rather than comparisons to the *Evans* case.

For the reasons herein discussed, the court determines that the waiver provided in Mr. Hinojosa's Plea Agreement never went into effect, as he never entered a guilty plea. The court also determines that the Plea Agreement, Plea Agreement Supplement, and Factual Résumé were executed in furtherance of plea negotiations that did not result in a guilty plea. Thus, the plea paperwork, which includes the aforementioned documents, are inadmissible, as the statements therein fall squarely within the protections provided by Federal Rule of Civil Procedure 11 and Federal Rule of Evidence 410.

Moreover, even if the Plea Agreement and Factual Résumé were admissible, the court deems such information cumulative, unnecessary, and a waste of time under Federal Rule of Evidence 403, and, therefore, inadmissible on this basis as well in light of Mr. Hinojosa's

---

[6] The Government submitted a portion of the transcript from the *Evans* sentencing hearing. *See* Doc. 436-3. The court, however, refers to the full transcript when necessary.

statements during the July 10, 2017 meeting, which the court has ruled are admissible. Accordingly, the court **grants** Defendant's Motion to Suppress to the extent he seeks to suppress the Factual Résumé (Doc. 126), Plea Agreement (Doc. 127), and Plea Agreement Supplement (Doc. 128). The Government, therefore, is not permitted to introduce these documents during trial.

## V.      Motion for Hearing

As previously stated, the crux of Mr. Hinojosa's argument in support of suppression is that the statements during the July 10, 2017 meeting and the subsequent Plea Agreement were made in furtherance of plea negotiations, rather than an argument that he was improperly pressured into making such statements. The court views these two assertions as separate and distinct. To the extent that Mr. Hinojosa claims that his former counsel, Mr. Perez, improperly pressured him to make the statements at issue during the July 10, 2017 interview, the court determines that Mr. Hinojosa failed to sufficiently support and address this allegation. Moreover, the court determines that there is no need for a hearing to address this potential defense, as Defendant had the opportunity to raise it with adequate support in his Motion to Suppress. Accordingly, the court **denies** the Government's Motion for Hearing (Doc. 412).

## VI.      Conclusion

For the reasons herein stated, the court **denies** the Government's Motion for Hearing (Doc. 412); and **denies in part** Defendant's Motion to Suppress Statements and Plea Paperwork (Doc. 432), to the extent he seeks to suppress statements he made during the July 10, 2017 meeting. Accordingly, these statements are admissible, and the Government is permitted to use them at trial. The court also **grants in part** Defendant's Motion to Suppress (Doc. 432), to the extent he seeks to suppress the Factual Résumé (Doc. 126), Plea Agreement (Doc. 127), and Plea Agreement

Supplement (Doc. 128). Accordingly, these documents are inadmissible under Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410(a).

**It is so ordered** this 25th day of February, 2020.

Sam A. Lindsay
United States District Judge