IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ALFREDO NAVARRO HINOJOSA (09)<br>MIGUEL CASAS (10)<br>MARTIN SALVADOR RODRIGUEZ (11) | CRIMINAL NO.   3:16-CR-536-L |

**GOVERNMENT'S OMNIBUS RESPONSE TO MOTIONS FOR
JUDGEMENT OF ACQUITTAL AND MOTIONS FOR A NEW TRIAL**

Defendants Alfredo Hinojosa, Miguel Casas, and Martin Salvador Rodriguez have each filed a motion for judgment of acquittal and a motion for a new trial, following their convictions on November 5, 2021.   (*See* Dkt. Nos. 751, 749, and 750, respectively.)   The motions should be denied.   For the most part, the motions are boiler-plate recitations of shallow legal arguments made at trial and present no reason for the Court to overturn the verdict rendered by the jury or to order a new trial.

**RELEVANT PROCEDURAL BACKGROUND**

The defendants were charged by superseding indictment on December 5, 2017. (*See* Dkt. No. 125.)   Count Nineteen charged Hinojosa, Casas, and Rodriguez with Managing a Drug Premises, in violation of 21 U.S.C. §§ 856(a)(2) and 2.   Count Twenty charged Hinojosa, Casas, and Rodriguez with Conspiracy to Manage a Drug Premises, in violation of 21 U.S.C. § 846.   Count Twenty-Five charged Hinojosa, Casas, and Rodriguez with Conspiracy to Possess with Intent to Distribute a Controlled Substance, in

violation of 21 U.S.C. § 846. The defendants were charged with several other counts, which are irrelevant for purposes of the current issues before the Court.

Jury selection in this case began on September 21, 2021. (*See* Dkt. No. 682.) The trial in this matter commenced on September 24, 2021. (*See* Dkt. No. 682.) Following the conclusion of the government's case-in-chief, each of the defendants moved for a judgment of acquittal, to which the Court reserved ruling. The parties made closing arguments on October 29, 2021. (*See* Dkt. No. 726.)

The jury deliberated for five days. On November 5, 2021, the jury returned a verdict that found each of the defendants guilty on Counts 19, 20, and 25. (*See* Dkt. No. 732.) This included a special finding as to Count 25 that the amount of cocaine involved in the offense was more than five kilograms. (*See id*. at 2.) The jury could not reach a verdict on Counts 1-8, 10-11, 13-18, and 21. (*See id generally*.)

Following the verdict, each of the defendants made oral requests to extend their time to file Rule 29 and Rule 33 motions. The Court granted these requests and ordered the parties to file any such motions by December 12 and 13, respectively. (*See* Dkt. Nos. 742 and 743.)

The parties filed their motions on December 13, 2021, a day after the deadline imposed by the Court for the Rule 29 motions. (*See* Dkt. Nos. 749-751.)

## LEGAL STANDARD

A motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 challenges "the sufficiency of the evidence to sustain a conviction." *United States v.*

*Uvalle-Patricio*, 478 F.3d 699, 701 (5th Cir. 2007). "When the defendant challenges the sufficiency of the evidence, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Miles*, 360 F.3d 472, 476 (5th Cir. 2004) (*quoting Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The court determines "only whether the jury made a rational decision, not whether its verdict was correct on the issue of guilt or innocence." *United States v. Dean*, 59 F.3d 1479, 1484 (5th Cir. 1995) (citations omitted). "[I]f the fact finder was presented with sufficient evidence to support the verdict reached, that verdict must be upheld." *United States v. Lucio*, 428 F.3d 519, 522 (5th Cir. 2005). "All reasonable inferences [that] tend to support the Government's case must be accepted. Any conflicts in the evidence must be resolved in the Government's favor." *United States v. Burns*, 597 F.2d 939, 940-41 (5th Cir. 1979) (citations omitted).

Rule 33(a) of the Federal Rules of Criminal Procedure allows the court, upon a defendant's motion, to "vacate any judgment and grant a new trial if the interest of justice so requires." A motion for new trial should not be granted "unless there would be a miscarriage of justice or the weight of evidence preponderates against the verdict. A new trial is granted only upon demonstration of adverse effects on substantial rights of a defendant." *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004), cert. denied, 544 U.S. 978 (2005).

To prove Count Nineteen, the government was required to prove beyond a reasonable doubt (1) that the defendant either managed or controlled a place, whether permanently or temporarily; (2) that such defendant was an owner, lessee, agent, employee, occupant, or mortgagee of such place; and (3) that such defendant knowingly and intentionally made the place available, with or without compensation, for other individuals to use, with knowledge that those individuals had the purpose of unlawfully using, storing, or distributing cocaine, which is a controlled substance. As the court instructed the jury, "place" means any building, room, or enclosure.

To prove Count Twenty, the government was required to prove beyond a reasonable doubt (1) that two or more persons, directly or indirectly, reached an agreement to manage a drug premises; (2) that the defendant knew of the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement willfully, that is, with the intent to further its unlawful purpose. As the court instructed the jury, one may become a member of a conspiracy without knowing all the details of the unlawful scheme or the identities of all the other alleged conspirators. If a defendant understands the unlawful nature of a plan or scheme and knowingly and intentionally joins in that plan or scheme on one occasion, that is sufficient to convict him for conspiracy even though the defendant had not participated before and even though the defendant played only a minor part.

The government need not prove that the alleged conspirators entered into any formal agreement, nor that they directly stated between themselves all the details of the scheme. Similarly, the government need not prove that all of the details of the scheme alleged in

**Government's Omnibus Response — Page  4**

the indictment were actually agreed upon or carried out, nor must it prove that all of the persons alleged to have been members of the conspiracy were such, or that the alleged conspirators actually succeeded in accomplishing their unlawful objectives.

Mere presence at the scene of an event, even with knowledge that a crime is being committed, or the mere fact that certain persons may have associated with each other and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy. A person who has no knowledge of a conspiracy, but who happens to act in a way that advances some purpose of a conspiracy, does not thereby become a conspirator.

To prove Count Twenty-Five, the government was required to prove beyond a reasonable doubt (1) that two or more persons, directly or indirectly reached an agreement to possess with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance; (2) that the defendant knew of the unlawful purpose of the agreement; (3) that the defendant joined in the agreement willfully, that is, with the intent to further its unlawful purpose; (4) that the overall scope of the conspiracy involved at least five kilograms of a mixture or substance containing a detectable amount of cocaine; and (5) that the defendant knew or reasonably should have known that the scope of the conspiracy involved at least five kilograms of a mixture or substance containing a detectable amount cocaine.

## SUMMARY OF DEFENDANT'S ARGUMENTS

A. ***Hinojosa*** – Defendant Hinojosa filed a ten-page motion for judgment of acquittal and a new trial. (*See* Dkt. No. 751.) In it, Hinojosa argues that "there is no evidence that Defendant had any knowledge whatsoever that drugs were regularly being sold in the bathrooms of his venues" and "[t]here was no evidence that defendant has any knowledge of the sale occurring." (*Id*. at 4.) Later, Hinojosa concedes that he did become "aware of the drug sales occurring after March 25, 2015." (*Id*.) Hinojosa spent a significant portion of his brief attacking certain government witnesses, including Juan Lara, Luis Rendon, and Humberto Novoa. With regard to Hinojosa's confession on July 10, 2017, Hinojosa argued that "this statement was given without any advice from Defendant's attorney."[1] (*Id*. at 6.) Oddly, Hinojosa spent three pages of his filing focused on Count 21, despite that not being a count of conviction. (*Id*. at 6-8.) Finally, Hinojosa attacked the jury's finding that the conspiracy involved more than five kilograms of cocaine and argued that the Court should rely only on the amount of cocaine seized during controlled drug buys. (*Id*. at 9.)

B. ***Casas*** – Defendant Casas filed a 22-page, single spaced motion for judgment of acquittal and a new trial. (*See* Dkt. No. 749.) In it, Casas spends a considerable portion of his brief reciting his view of the evidence, through a partisan summary of the testimony. The vast bulk of the filing (pages 2-18) is spent attacking Count Twenty-Five.

---

[1] This argument makes little sense, as Hinojosa was aided throughout his confession and before his confession by veteran defense attorney Frank Perez.

**Government's Omnibus Response — Page  6**

It contains numerous conclusory and wild statements. (*See e.g.*, page 18: "Mr. Novoa did not testify to a single fact related to a conspiracy to possess with the intent to distribute drugs." (*See id*. at 11.) Casas appears to focus his argument on whether or not Casas personally possessed cocaine or agreed to personally possess cocaine, as opposed to whether he was involved in a conspiracy to possess cocaine with the intent to distribute.

    C.    ***Rodriguez*** – Defendant Rodriguez filed a 5-page, motion for judgment of acquittal and a new trial. (*See* Dkt. No. 750.) In a conclusory fashion, Rodriguez argues that "the government failed to meet its burden of proving each element of the substantive offenses beyond a reasonable doubt." (*Id*. at 3.) He provides little to no discussion of the facts adduced at trial.

## EVIDENCE ADDUCED AT TRIAL

The evidence for each of the three charges at issue can be discussed together. This evidence could be broadly categorized as (1) controlled purchases, (2) witness testimony, and (3) recorded statements and confessions.

The government introduced evidence of seventeen different controlled purchases of cocaine between January 8, 2013 through October 14, 2016. With regard to these purchases, multiple witnesses testified how the sales were similar across night clubs and cities and that the sales were performed in an open, brazen manner. Officer Mike Nunez testified that the bathrooms were "like a busy convenience store." With respect to Count Nineteen, the government introduced specific evidence of a controlled purchase of five

baggies of cocaine at the OK Corral in Dallas on October 14, 2016. The evidence included a video recording of the undercover controlled purchase.

The government also introduced evidence of surreptitious recordings of the defendants. These included recordings of Alfredo Hinojosa from March 25, 2015, stating "Let me—let me tell you the truth. Okay, this is the truth. When—when we don't allow anyone, when I get really tough in the bathrooms . . . fucking customers complain. We were losing business to 2001 because we didn't allow any of that shit." (Exhibits 73 and 74.) As discussed at trial, this conversation related to the sale of cocaine in the bathrooms of Hinojosa's nightclubs.

Later, on October 23, 2015, Hinojosa told Casas and his head of security, Eddie Villarreal that "we need cocaine man." (Exhibits 107 and 108.) On that same date, Hinojosa remarked "we don't want to get rid of them [drug dealers] because bro, we have problems if we don't have somebody moving shit [cocaine] there . . . so we got to play this fucking game." (*Id*.)

On October 21, 2016, Hinojosa told Villarreal, in reference to the cocaine sales in the bathrooms, that "we can't really clean it because then we lose business." (Exhibits 75 and 76.)

As these examples illustrate, Hinojosa routinely instructed his employees to allow the drug sales because, if they did not, the businesses run by the defendants would lose business. As shown at trial, only after Hinojosa and his colleagues became aware of the FBI's investigation did they begin to crack down on drug sales in the bathrooms.

**Government's Omnibus Response — Page 8**

Multiple witnesses (including Humberto Novoa and Luis Rendon) testified about a meeting that occurred at the end of 2015 or in early 2016 where the defendants – Alfredo Hinojosa, Mike Casas, and Martin Salvador Rodriguez – were all present and all agreed that they had to allow cocaine sales in the bathrooms to resume because they were losing so much business. This was a specific agreement that forms the heart of the conspiracies alleged in Counts 20 and 25.

Other corroborating testimony was obtained throughout the government's case-in chief. Luis Rendon told the jury that he reported the drug sales to Hinojosa, Casas, and Rodriguez. Rendon stated that Rodriguez told him, with respect to the drug dealers, to "let them do their thing." According to Rendon, Casas told him that the drug dealers "have to be faster than you." Security guard Juan Julio Rodriguez testified that Hinojosa told him to leave the bathroom dealers alone because they were "bad but necessary." Casas told Juan Julio Rodriguez to keep a bribe he had received from the drug dealers. Humberto Novoa testified that the managers (Hinojosa, Casas, and Rodriguez) have known about the drug sales in the bathrooms for years. Defense witness Ali Valdez corroborated this fact.

The government called multiple on-the-scene drug dealers as witnesses as well. This included Juan Lara, who testified that his drug trafficking crew was allowed to sell cocaine in the bathrooms openly while other drug dealers were not. Humberto Ovila-Cruz testified that he sold drugs in Hinojosa's nightclubs between 2013 and 2016 and that he saw the primary drug dealers in the bathrooms speaking with Rodriguez. Jose Javier

**Government's Omnibus Response — Page  9**

Mendoza-Martinez testified that he sold drugs within the nightclubs before and after the law enforcement raids in 2015. Mauricio Garcia Mentado testified that he sold cocaine in the nightclubs between August 2016 and October 2016. He testified that he knew his crew of cocaine dealers had permission to sell in the nightclubs based on his own observations. Mentado was also seen selling cocaine in the video from the undercover buy on October 14, 2016.

Security guard Erick Lopez Cuellar testified that he was told by management not to worry about the cocaine dealers in the bathroom and when he raised questions about the drug sales, he was reassigned.

With respect to their own control over these drug sales, one of the defense's witnesses, manager Ali Valdez, testified that all of the managers were aware of the cocaine sales for years and they had weekly meetings where they discussed pressing issues.

Additionally, at trial, the government introduced evidence of each of the defendant's own confessions. Hinojosa sat for a lengthy recorded interview on July 10, 2017. (*See* Exhibits 87 and 88.) In it, he admitted that he controlled the nightclubs, was the ultimate decision-maker, but also relied on his top managers to make decisions. On *nine* different occasions during this interview, Hinojosa admitted that he was aware of the cocaine sales in the bathroom and knowingly allowed them to continue. (*See* Exhibits 87 and 88 at pages 16, 19, 22-23, 25, 28, 33, 41-42.)

In Casas's interview, he stated that he, Hinojosa, and Rodriguez had conversations about the drug sales in the nightclubs and decided to not stop the drug sales because it was

detrimental to the business and the business was "tanking." Casas provided specific numbers with regards to the impact on the business when drug sales were stopped, indicating they could lose up to 50% of their business. Casas stated that the managers provided specific instructions to the bouncers on how to handle the drug sales in the bathrooms so that they did not lose business.

Similarly, in his interview, Rodriguez discussed the infamous 2016 meeting where he and the other top managers decided to allow drug sales to continue but that they needed to be discreet in the sales.

The government also introduced evidence regarding the decline in business based on the confessions and opinion testimony from Eric Lee.

With respect to the jury's finding that more than five kilograms was involved in the conspiracy, this was a hotly debated issue during the trial. The government introduced evidence, through various drug dealers that, at a minimum, 150 bags were sold each weekend at the various nightclubs. If each bag contained .2 grams of cocaine and these sales occurred over a four-year period (208 weeks) (as established at trial), that would amount to over 6.4 kilograms of cocaine. This amount is conservative and does not include the larger seizures from Josephine Hinojosa (14 kilograms).

## APPLICATION OF EVIDENCE TO ELEMENTS

### A. Count Nineteen

For Count Nineteen, the government proved:

(1) *that the defendant either managed or controlled a place, whether permanently or temporarily* – This element was largely uncontroverted. Hinojosa owned and controlled the OK Corral in Dallas. Mike Casas was the General Manager of the nightclub. Martin Salvador Rodriguez was a top manager of this nightclub. Many patrons believed him to be the owner. He held himself out to be the owner in several ways.

(2) *that such defendant was an owner, lessee, agent, employee, occupant, or mortgagee of such place* – Again, this element is largely uncontroverted. Hinojosa was the undisputed owner of the club. Casas was its General Manager. Rodriguez was clearly an agent or employee of the club given his role vis-à-vis Hinojosa and the nightclub itself.

(3) *that such defendant knowingly and intentionally made the place available, with or without compensation, for other individuals to use, with knowledge that those individuals had the purpose of unlawfully using, storing, or distributing cocaine, which is a controlled substance* – As discussed in the evidence above, each of the defendants confessed that they knowingly agreed to allow the cocaine sales to occur in the nightclubs because if they did not, they would lose money. These confessions were corroborated by surreptitious recordings. Agents purchased drugs on the date in question (October 14, 2016) at the OK Corral in Dallas. This transaction was video recorded. The parties stipulated that the substance that was purchased was cocaine. Given the

volume of evidence regarding the consistency of drug sales in the bathrooms, this was not a one-time oversight, mistake, or aberration.   This was a planned business strategy.

### B.   Count Twenty

For Count Twenty, the government proved:

(1) ***that two or more persons, directly or indirectly, reached an agreement to manage a drug premises*** – The government proved that there was an agreement by the defendants to knowingly allow cocaine sales in the nightclubs because if such sales were not allowed, the profits of the nightclubs would decrease.   The evidence regarding this agreement is discussed in detail above but includes the confessions of each of the three defendants regarding this agreement and the testimony of other witnesses regarding this agreement (including Novoa and Rendon).   These confessions were corroborated by surreptitious recordings.   The direct evidence of this agreement was corroborated by the consistent pattern of the drugs sales, illustrated by the seventeen different controlled drug purchases, the extensive testimony regarding the drugs sales, and the financial evidence of the impact on the businesses when cocaine sales were stopped.

(2) ***that the defendant knew of the unlawful purpose of the agreement*** –There is no argument by the defendants that, if the government can prove the agreement existed, each of the defendants did not know that allowing cocaine sales to occur

in the bathroom was illegal. In effect, there was no claim of ignorance of the law.

(3) ***that the defendant joined in the agreement willfully, that is, with the intent to further its unlawful purpose*** – There is no argument by the defendants that, if the government can prove the agreement existed, each of the defendants were forced to enter into the agreement by duress. Oppositely, the government adduced evidence that the defendants all willfully entered into the agreement because it helped secure profits at the nightclubs, where they each worked. This was established through each of their confessions, the surreptitious recordings, and the pattern of conduct at the clubs.

### C. Count Twenty-Five

For Count Twenty-Five, the government proved

(1) ***that two or more persons, directly or indirectly reached an agreement to possess with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substances*** – The government proved that there was an agreement by the defendants to knowingly allow cocaine sales in the nightclubs because if such sales were not allowed, the profits of the nightclubs would decrease. The evidence regarding this agreement is discussed in detail above but includes the confessions of each of the three defendants regarding this agreement and the testimony of other witnesses regarding this agreement (including Novoa and

Rendon). These confessions were corroborated by surreptitious recordings. The direct evidence of this agreement was corroborated by the consistent pattern of the drugs sales, illustrated by the seventeen different controlled drug purchases, the extensive testimony regarding the drugs sales, and the financial evidence of the impact on the businesses when cocaine sales were stopped.

(2) *that the defendant knew of the unlawful purpose of the agreement* – There is no argument by the defendants that, if the government can prove the agreement existed, each of the defendants did not know that allowing cocaine sales to occur in the bathroom was illegal. In effect, there was no claim of ignorance of the law.

(3) *that the defendant joined in the agreement willfully, that is, with the intent to further its unlawful purpose* – There is no argument by the defendants that, if the government can prove the agreement existed, each of the defendants were forced to enter into the agreement by duress. Oppositely, the government adduced evidence that the defendants all willfully entered into the agreement because it helped secure profits at the nightclubs, where they each worked. This was established through each of their confessions, the surreptitious recordings, and the pattern of conduct at the clubs.

(4) *that the overall scope of the conspiracy involved at least five kilograms of a mixture or substance containing a detectable amount of cocaine* – The government proved that more than five kilograms was involved in the

conspiracy through various drug dealers that, at a minimum, 150 bags were sold each weekend at the various nightclubs. If each bag contained .2 grams of cocaine and these sales occurred over a four-year period (208 weeks) (as established at trial), that would amount to over 6.4 kilograms of cocaine. This amount is conservative and does not include the larger seizures from Josephine Hinojosa (14 kilograms).

(5) ***that the defendant knew or reasonably should have known that the scope of the conspiracy involved at least five kilograms of a mixture or substance containing a detectable amount cocaine*** – Multiple witnesses testified that each of the defendants were aware of the constant cocaine sales in the nightclubs. One defense witness, Ali Valdez, admitted that the drug sales took place every day. Other witnesses, including Humberto Novoa, testified that the drugs sales had been ongoing for years and that all of the mangers were well aware of the consistent pattern of cocaine sales in the nightclubs.

In response to Casas's argument which focused on whether Casas personally possessed cocaine or agreed to personally possess cocaine, such an argument is a red herring and misunderstands the law. As other courts have stated, "[t]he government was not required to prove that [the defendant] personally bought, sold, or possessed any narcotics in order to obtain a conviction under 21 U.S.C. § 846, only that he agreed to the activities. *See United States v. Bolivar*, 532 F.3d 599, 603 (7th Cir. 2008); *United States v. Johnson*, 592 F.3d 749, 754 n.4 (7th Cir. 2010); *see also United States v. Morales*, 655

F.3d 608, 639 (7th Cir. 2011) ("that no evidence conclusively proved that Hernandez personally bought, sold, or possessed any narcotics does not prevent a jury from finding him guilty of violating 21 U.S.C. § 846. The jury could reasonably infer from the totality of the evidence that Hernandez joined the Insane Deuces' narcotics conspiracy.") In the instant case, Casas's decision to allow the nightclubs that he managed to be openly used for the sale of the cocaine brought him within each of the conspiracies.

## CONCLUSION

The motions submitted by Defendants Hinojosa, Casas, and Rodriguez should be denied.

Respectfully submitted,

CHAD E. MEACHAM
UNITED STATES ATTORNEY

/s/  P.J. MEITL
P.J. MEITL
Assistant United States Attorney
District of Columbia Bar No. 502391
Virginia Bar No. 73215
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214.659.8680
Facsimile: 214.659.8812
Email: philip.meitl@usdoj.gov